UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

AMANDA THOMPSON,               )
                              )
          Plaintiff            )
                              )
     vs.                       )          Case No.   3:17-cv-01053-HNJ
                              )
CITY OF FLORENCE,              )
ALABAMA, et al.,               )
                              )
          Defendants           )

## MEMORANDUM OPINION

This action proceeds on a Motion for Summary Judgment filed by Defendants City of Florence, Alabama, Bennie Johnson, Jeff Redcross, and Guy Lambert.   Plaintiff Amanda Thompson advanced 42 U.S.C. § 1983 claims against the Defendants for unlawful entry, unlawful arrest, and excessive force in violation of the Fourth Amendment to the United States Constitution, and state law claims for false arrest, false imprisonment, and assault and battery.

Pursuant to the review herein, Defendants Redcross and Johnson attain qualified immunity on Thompson's Fourth Amendment claims. Furthermore, state-agent immunity bars Thompson's state-law claims.   Finally, Thompson acceded to dismissal

of the remaining claims.[1]  Therefore, for the reasons set out herein, the court **GRANTS** Defendants' summary judgment motion.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor.  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted).  The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116

---

[1] Thompson's complaint alleges claims of illegal seizure, excessive force, and violations of state law against Lambert and municipal liability against the City of Florence, Alabama ("City"). (Doc. 1 at 5-8). In response to Defendant's motion for summary judgment, Thompson agrees to the dismissal of the City and Lambert. Therefore, the court **GRANTS** summary judgment on all claims against both the City and Lambert. This action proceeds on the remaining claims against Johnson and Redcross.

(11th Cir. 1993). In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a

situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by producing materials disproving an essential element of a non-movant's claim or defense. *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not significantly probative, the court may grant summary judgment. *Anderson*, 477 U.S. at 249. That is, the movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, but the court should deny summary judgment if reasonable jurors could "differ as to the import of the evidence." *Id.* at 250.

## FACTS[2]

**Amanda Thompson's Apartment**

At the time of the events underlying this action, Plaintiff Amanda Thompson resided in Florence, Alabama, in an apartment below-street grade on the first floor of a building. (Thompson Dep. at 12). The building consists of an entrance adjacent to an

---

[2] Pursuant to the foregoing summary judgment standard, the following facts are undisputed or, if disputed, taken in a light most favorable to the non-moving party.

alleyway, which remains locked and accessible by key or by having a resident "buzz" a visitor inside. (Thompson Dep. at 174-75, 190-91).

The first floor apartments include outdoor patios that abut a concrete retaining wall and sit several feet below street level. The patio areas are visible from the sidewalk above. (Doc. 28 at 55-58). Each first-floor apartment accesses the patio area via their rear doors, and a resident or guest may also access the patio area from the outside by traversing a grassy area next to the building and proceeding through a wooden, entry gate. (Thompson Dep. at 189-90). The gate remained open during the night of the events at issue. (Thompson Dep. at 168).

**The Individual Defendant Officers Patrol the 2015 W.C. Handy Festival**

The W.C. Handy Festival is an annual, week-long festival that occurs in downtown Florence. In 2015, the Florence Police Department assigned Officers Bennie Johnson, Jeff Redcross, Guy Lambert, and Danny Hines to patrol downtown Florence in plainclothes during the festival to focus on minimizing and eliminating public intoxication and public urination. (Lambert Dep. at 31:1-5). For the events at issue, their shift commenced on Saturday, July 25, 2015, and ended once the local bars closed at 2:00 a.m.

**Saturday, July 25, 2015**

On Saturday evening, July 25, 2015, Thompson and her friend Sara Kilpatrick went out to dinner. (Thompson Dep. at 53:21-22). Thompson and Kilpatrick returned

to her apartment after dinner and continued drinking. (Thompson Dep. at 56:15-22; 57:10-12). A couple of hours later, Thompson and Kilpatrick walked to FloBama Bar and Restaurant, where Thompson was employed but had the night off. (Thompson Dep. at 60 and 62). While at FloBama, Thompson's boyfriend, Mason Kemp, and his friend, Cody Sloas, agreed to stop by Thompson's apartment after their shifts at FloBama ended. (Thompson Dep. at 63).

Thompson and Kilpatrick returned to her apartment around 11:00 p.m., and Kamp and Sloas arrived less than an hour later. (Thompson Dep. at 65:6-11). Kamp and Sloas proceeded through the open wooden gate and into Thompson's apartment via the rear patio door. (Thompson Dep. at 67:5). Thompson could not recall whether she consumed any additional alcohol that evening, and Kamp had nothing to drink because he was only twenty years old at the time. (Thompson Dep. at 73:1-12; 74:19-23).

**Sunday, July 26, 2015**

Around 2:00 a.m. on Sunday morning, Kilpatrick requested Thompson's assistance in the bathroom to help her take off her outfit. (Thompson Dep. at 75:14-19). While Thompson and Kilpatrick were in the bathroom, Kamp went outside to the patio, exposed his penis, and urinated. (Doc. 30-1 at 2). Kamp stated in a declaration that he urinated in a corner where the wooden gate abuts the concrete wall, and no one could see his penis from the sidewalk above the patio. (*Id.*) Thompson did not know

Kamp had gone outside until she exited the bathroom, and it was not a common practice for guests to urinate on her patio. (Thompson Dep. at 83-83, 86-87).

Near the conclusion of his shift, Officer Johnson walked on the sidewalk that passed above Thompson's patio. (Johnson Dep. at 31:5-32:5). As Johnson was walking, he peered down and saw Kamp while he was urinating. (Johnson Dep. at 31:5-32:5).

Johnson paused for Kamp to finish, and he pulled out his badge and displayed it once Kamp looked up. (Johnson Dep. at 42:15-17). Johnson then declared he was a police officer, (Johnson Dep. at 44:10-13), and he informed Kamp that he could not urinate in public. (Johnson Dep. at 43:1-2).

Kamp asked Officer Johnson for identification because he believed Johnson may be posing as a police officer. (Exhibit 1-A, Audio Recording of Mason Kamp).[3] Subsequently, after some disputed remarks, Kamp went back into Thompson's apartment through the rear patio door.[4] Kamp and Thompson both declared that

---

[3] Kamp's recitation occurred during a telephone call he convened with a Florence Police Department investigator after the events in question.

[4] Johnson testified that Kamp saw the badge and said "that badge don't mean shit to me." (Johnson Dep. at 43:3-4). Johnson further testified that after informing Kamp of his conduct, Kamp replied, "this is my fucking house, and I do whatever I want." (Johnson Dep. at 44:1-3). Johnson declared that he then informed Kamp to stay put. (Johnson Dep. at 44:5-8). Kamp disputes Johnson's testimony, stating Johnson never told him to stay put. (Doc. 30-1 at 2). Johnson testified that Kamp invited Johnson to "come on", but quickly fled into Thompson's apartment. (Johnson Dep. at 24).

Kamp alleged he never represented he owned Thompson's apartment, and Johnson never told Kamp he was under arrest or to stay put. (Doc. 30-1 at 2). Kamp further alleged in his phone call with the Florence Police investigator that he did not flee from Johnson when returning to Thompson's apartment. (Exhibit 1-A, Audio Recording of Mason Kamp).

upon re-entering Thompson's apartment, Kamp informed Thompson someone outside may be posing as a police officer, yet Kamp did not relay anything else regarding his conversation with Johnson. (Exhibit 1-A; Thompson Dep. at 81:7-11).

Notwithstanding the dispute regarding the remarks exchanged between Johnson and Kamp, Johnson decided to apprehend Kamp for the alleged urination on the patio. Johnson did not know how to access Thompson's patio area from the sidewalk, so he spent a few minutes looking for the main entrance. (Johnson Dep. at 44-45). He encountered Officer Redcross during his search, and Johnson informed Redcross that he was attempting to arrest a male subject for urinating in public view. (Johnson Dep. at 45:6-8). After searching the building for an entrance, Johnson and Redcross discovered the open wooden gate leading to Thompson's patio. (Johnson Dep. at 52:1-5). The two officers proceeded through the gate before knocking on Thompson's patio door. (Johnson Dep. at 52:9-11).

Upon the knocking on the patio door, Plaintiff Thompson opened it and observed Redcross and Johnson in plainclothes standing at her entrance. (Thompson Dep. at 87:3-15; 192:18-20). Thompson remained unaware that Kamp had urinated outside. (Thompson Dep. at 82:1-3). Both officers informed Thompson they needed to speak with the "gentleman" that was recently outside her apartment. (Thompson Dep. at 87:18-21; Johnson Dep. at 54:14-16). Thompson responded, "this is my apartment, what's going on?" (Thompson Dep. at 87:23-88:1). Thompson remembered no further

exchanges at the door except Redcross asking her again to see the "gentleman" that was just outside. (Thompson Dep. at 88:15-18).[5]

Upon hearing Redcross's request to speak with the "gentleman" who was just outside, Kamp appeared from behind Thompson where the officers could see him. (Thompson Dep. at 88:20-89:1; Johnson Dep. at 55:15-19).[6] In an attempt to seize Kamp, the officers bumped Thompson with the door as Redcross followed Kamp when he receded into the apartment. (Thompson Dep. at 91:11-13). As Johnson followed Redcross, Thompson testified that "everything kind of went chaotic."[7] (Thompson Dep. at 89:3-4). The officers and Kamp engaged in an altercation as they attempted to arrest Kamp. As the scrum ensued between the two officers and Kamp, Sloas joined the encounter when he saw the two officers "get on" Kamp. (Thompson Dep. at 97:9-11; 97:21-98:3). Thompson declared to the officers they were not allowed in her apartment and had no right to be there. (Thompson Dep. at 96:9-12). )

Kamp urged Thompson to call 911 and grab her gun for self-defense. (Thompson Dep. at 98; Exhibit 1-A). Thompson reached into her purse and grabbed a

---

[5] Johnson testified he had his badge in his hand when Thompson opened the door, and he informed Thompson he was a Florence Police officer. (Johnson Dep. at 54:8-10). Johnson further testified that Thompson did not utter any remarks regarding the ownership of the apartment. (Johnson Dep. at 100:17-18).

[6] Johnson testified that he informed both Thompson and Kamp that Kamp was under arrest. (Johnson Dep. at 57:17-18).

[7] Johnson testified that as he was entering through the door to arrest Kamp, Thompson slammed the door to prevent Kamp's arrest. (Johnson Dep. at 141:10-13).

loaded 9mm Ruger handgun. (Thompson Dep. at 99:11-16; 108:9-10). She pointed the gun towards the floor and called 911 with her free hand. (Thompson Dep. at 12:15-16; 108:9-10). Thompson alleged that she had not seen a badge from either of the officers by this point in the evening. (Thompson Dep. at 105:5-11).

In an audio recording of her 911 call, Thompson informed the operator that two black men "posing as police officers" (Johnson and Redcross are African-American) were in her apartment; that both men had Kamp and Sloas down on the floor; they had placed someone in handcuffs; and they "ha[d] broken half of [her] shit in [her] apartment for no reason." (Exhibit E, Amanda Thompson 911 Call Audio). During the call, backup officers arrived on the scene, and thus, Thompson informed the operator she saw a uniformed police officer in her apartment. (*Id.*)

Correspondingly, Officers Lambert and Danny Hines arrived as backup. (Lambert Dep. at 67-68; 74). Lambert testified that shortly after he arrived, he recalled Redcross declaring,"[Thompson's] got to go." (Lambert Dep. at 107:6-8). The 911 recording identifies Thompson remarking, "you're not putting me in handcuffs." (Exhibit E). Lambert testified he saw Thompson back away quickly, and subsequently Redcross hauled her to the floor. (Lambert Dep. at 68:8-15). Thompson alleged that Redcross tackled her to the floor while she was on the telephone with the 911 operator.

(Thompson Dep. at 109:10-13).[8]   The 911 audio also recorded Thompson screaming before the call cuts off. (*Id.*)

Thompson's gun flew out of her hands as she fell. (Thompson Dep. at 115:17-19; 116:3-5). Hines yelled "gun" when he saw the firearm, and Lambert retrieved the weapon and unloaded it. (Lambert Dep. at 67-68; 74).

Thompson testified she resisted Redcross because she did not know he was a law enforcement officer attempting to arrest her. (Thompson Dep. at 116-17).   In addition, she did not understand Redcross was arresting her until he had her fully handcuffed on the floor. (Thompson Dep. at 197:11-17).

The officers transported Thompson, Kamp, and Sloas to jail without incident. (Thompson Dep. at 119-120).   Johnson proceeded to a hospital for treatment of injuries inflicted by Kamp and Sloas. (Johnson Dep. at 19).

**Post-Incident Timeline**

Local authorities charged Kamp with assault in the second degree, resisting arrest, and public lewdness. (Doc. 28 at133). He pleaded guilty to the lesser included offense of assault in the third degree. (Doc. 28 at 134). Local authorities charged Sloan with assault in the second degree and resisting arrest, and he eventually pleaded guilty to the lesser included offense of assault in the third degree. (Doc. 28 at 135-36).

---

[8] Thompson testified that she did not know on the night of the incident who was trying to arrest her. (Thompson Dep. at 198:6-8). She had originally identified Lambert as the officer who arrested her, but she later confirmed it was Redcross.

Authorities charged Thompson with resisting arrest regarding her alleged interference with the arrests of Kamp, Sloas, and/or herself. (Doc. 28 at 137). The state court *nolle prossed* Thompson's criminal case with leave to reinstate in exchange for her agreement to give truthful testimony against Kamp and Sloas if their felony cases proceeded to trial. (Doc. 28 at 138).

Thompson testified that she incurred bruising on her arms and thighs that remained visible for a few weeks after the incident. (Thompson Dep. at 160:10-15). In December 2015, approximately five months after the incident, Thompson began seeing a therapist. (Thompson Dep. at 129). She informed her therapist she had anxiety because there was a concert at FloBama that brought a lot of black customers, and they reminded her of Officers Johnson and Redcross. (Thompson Dep. at 132:3-7). She experienced panic attacks and struggles from anxiety as a result of the incident. (Thompson Dep. at 130:2-5; 136:12-21). However, she had not experienced a panic attack in the year preceding her deposition. (Thompson Dep. at 141:3-4).

## ANALYSIS

Thompson claims Johnson and Redcross violated Fourth Amendment rights prohibiting unlawful entry, false arrest, and excessive force. Johnson and Redcross argue they deserve qualified immunity from Thompson's claims. As the following analyses portray, Johnson and Redcross merit qualified immunity on all claims.

Qualified immunity protects government officials performing discretionary functions in their individual capacity from civil suit and liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hill v. Cundiff*, 797 F.3d 948, 978 (11th Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When a court concludes [an official] was engaged in a discretionary function, 'the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity.'" *Hill*, 797 F.3d at 978 (citation omitted). There exists no dispute Johnson and Redcross performed discretionary functions in these circumstances, so Thompson bears the burden of persuasion on the balance of the qualified immunity inquiry: Johnson and Redcross violated a constitutional right, and the right was clearly established at the time of the alleged violation. *Id.* (citation omitted). Courts retain discretion to adjudicate one prong without addressing the other. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Determining whether a constitutional right was clearly established may proceed in three guises. A right may be clearly established by "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Hill*, 797 F.3d at 979 (citation omitted). Under the second, afore-cited method, "every objectively reasonable government

official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* (citation omitted). The "clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, No. 17-1660, 2019 WL 113027, at *2 (U.S. Jan. 7, 2019) (per curiam).

Furthermore, a right is clearly established if a defendant acted on "fair warning" that his conduct violated the constitutional rights of the plaintiff. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citing *United States v. Lanier*, 520 U.S. 259 (1997)). As elaborated, "fair warning" may emanate either from factually similar case law or where the right is one of 'obvious clarity'- i.e., where the officer's conduct "lies so obviously at the very core of what the [constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to [the official], notwithstanding the lack of fact-specific case law" on point. *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009)).

In determining whether a right was clearly established, the court refers to binding decisions of the United States Supreme Court, the Eleventh Circuit, and the highest court of the pertinent state. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) (citing *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-63 (2007)).

The court will first determine whether Johnson and Redcross violated any of Thompson's constitutional rights. Examining whether Johnson and Redcross violated a constitutional right rests upon the standards applicable to the substantive doctrine at

issue. In assessing qualified immunity, a court may not resolve genuine disputes of fact in favor of the party seeking summary judgment.

Applying the foregoing concepts demonstrates that both Johnson and Redcross are entitled to qualified immunity from all of Thompson's claims.

## I. Johnson and Redcross's Warrantless Entry into Thompson's Apartment Was Constitutional

Thompson's unlawful entry claim posits Johnson and Redcross lacked probable cause and requisite exigent circumstances to enter her apartment without a warrant. The Fourth Amendment provides, in relevant part, that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Morris v. Town of Lexington Alabama*, 748 F.3d 1316, 1322 (11th Cir. 2014)(citing *Payton v. New York*, 445 U.S. 573, 585 (1980)(internal citation omitted)). As such, precedent firmly establishes that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)(internal quotation marks omitted). "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013).

Critically, this case presents two probable cause determinations regarding the officers' entry into Thompson's apartment. As established in analogous

circumstances, "law enforcement officers may not enter the home of a third party to search for the subject of an arrest warrant without first securing a search warrant for that home." *Bates v. Harvey*, 518 F.3d 1233, 1245 (11th Cir. 2008) (citing *Steagald v. United States*, 451 U.S. 204 (1981)); *see id.* at 1245 n. 12 ("[U]nder *Steagald*, an arrest warrant is not enough to permit lawful entry into a third party's home.") (citing *Steagald*, 451 U.S. at 205–06).   As explained by the Supreme Court:

> An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and his possessions against the unjustified intrusion of the police.

*Steagald*, 451 U.S. at 213, *quoted in*, *O'Rourke v. Hayes*, 378 F.3d 1201, 1209 (11th Cir. 2004)).   Therefore, on the qualified immunity determination at bar, Thompson must establish Kamp was not the "legitimate object of a search," that is, that the officers did not sustain probable cause to arrest Kamp for committing an offense.   In addition, Thompson must establish the officers did not possess probable cause to search her apartment for Kamp.   And, of course, Thompson must establish there ensued no exigent circumstances warranting entry into her apartment.

*The Officers Possessed Arguable Probable Cause to Arrest Kamp and Probable Cause to Search Thompson's Apartment for Kamp*

An arrest without probable cause constitutes an unreasonable seizure that violates the Fourth Amendment. *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). Conversely, an arrest buttressed by probable cause blunts a Fourth Amendment claim for false arrest. *See Gurrera v. Palm Beach Cnty. Sheriff's Office*, 657 F. App'x 886, 889 (11th Cir. 2016) (citing *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990)); *Case v. Eslinger*, 555 F.3d 1317, 1326-27 (11th Cir. 2009). Therefore, to preclude qualified immunity on a false arrest claim, a plaintiff must "show a lack of probable cause" for the arrest. *Guerrera*, 657 F. App'x at 889 (citation omitted). As countenanced, the unlawful entry claim requires Thompson to first establish that the officers did not possess probable cause to arrest Kamp. The following analysis reveals that Thompson fails in this regard.

Law enforcement officers may effect warrantless arrests "where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citations omitted). "Probable cause exists when 'the facts and circumstances within the officers' knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . an offense.'" *Miller v. Harget*, 458 F.3d 1251, 1259 (11th Cir. 2006) (citing *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998)). For probable cause to exist, "an arrest [must] be objectively reasonable under the totality of the circumstances," *Bailey v. Board of Cnty. Comm'rs of Alachua Cnty.,*

*Fla.*, 956 F.2d 1112, 1119 (11th Cir. 1992), and an officer's subjective intentions play no role in determining the existence of probable cause.   *See Rankin*, 133 F.3d at 1433-34.

The "substance of all the definitions of probable cause is a reasonable ground for belief of guilt . . . particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citations omitted); *see also United States v. $242,484.00*, 389 F.3d 1149, 1160 (11th Cir. 2004) ("Probable cause in this context is a 'reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion—the same standard used to determine the legality of arrests, searches, and seizures in criminal law.'") (citations omitted). "All we have required is the kind of 'fair probability' on which 'reasonable and prudent people, not legal technicians, act.'"   *Florida v. Harris*, 568 U.S. 237, 243 (2013) (citations and internal alterations omitted).   Although "not a high bar," probable cause "requires . . . a probability or substantial chance of criminal activity, not an actual showing of such activity."   *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018).

Indeed, in qualified immunity determinations, assessing probable cause commands a relaxed assessment.   To obtain qualified immunity on a Fourth Amendment unlawful seizure claim, an officer need only sustain "arguable" probable cause, not actual probable cause.   *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 735 (11th Cir. 2010).   Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as [a defendant] could have believed

that probable cause existed to arrest [a § 1983 complainant]." *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004) (quotation marks omitted). "Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable." *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) (quotation marks and ellipses omitted). Thus, the qualified immunity inquiry in the context of an arrest focuses on whether the officer reasonably, although perhaps mistakenly, believed that probable cause existed. *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002).

Assessing arguable probable cause rests upon the elements of the alleged crime and the operative fact pattern. *Skop v. City of Atlanta*, 485 F.3d 1130, 1137-38 (11th Cir. 2007); *Crosby v. Monroe Cnty., Ala.*, 394 F.3d 1328, 1333 (11th Cir. 2004). However, determining arguable probable cause does not require proof of every element of a crime. *Brown*, 608 F.3d at 735; *Scarbrough v. Myles*, 245 F.3d 1299, 1302-03 (11th Cir. 2001). If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply. *Skop*, 485 F.3d at 1138.

The authorities charged Kamp with public lewdness based upon his alleged conduct on Thompson's patio. Alabama law proscribes public lewdness as follows:

(a) A person commits the crime of public lewdness if:

> (1) He exposes his anus or genitals in a public place and is reckless about whether another may be present who will be offended or alarmed by his act; or
>
> (2) He does any lewd act in a public place which he knows is likely to be observed by others who would be affronted or alarmed.

Ala. Code § 13A-12-130(a). Under Alabama law, "[a] person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists." Ala. Code § 13-A-2-2(3).

Based upon the undisputed facts reviewed previously in the light most favorable to Thompson, reasonable officers may believe there existed probable cause to arrest Kamp for public lewdness. First, of course, Kamp admits that he exposed his penis while urinating on the patio, so that critical element is readily established.

Second, Thompson's patio constituted a public place. Federal courts in this district and the Alabama Supreme Court have consistently deemed the yard or curtilage of a private residence readily observable from a public thoroughfare as a "public place". *See Harris v. City of Hoover, Alabama*, CV 06-B-4613-S, 2008 WL 11424240, *5 (Alabama law has long defined as public a place where one's activities can be viewed by the public, including private property one may view from a public road or street); *Warren v. City of Auburn*, 337 So. 2d 1319, 1321 (Ala. 1976)(plaintiff's apartment yard, which one could observe from a public street, constituted a "public place); *Lee v. State*, 33 So. 894 (Ala.

1903)("A place in the yard or curtilage of a private house, 40 feet away and open to observation from a public highway, is per se a public place."); *cf. James v. City of Birmingham, Ala.*, 926 F. Supp. 2d 1260, 1268 (N.D. Ala. 2013)( under plaintiff's version of the events, defendant did not have probable cause for the arrest because plaintiff was drinking inside the doorway of a residence and thus was not in a public place). The undisputed facts, including the photographs of Thompson's apartment as viewed from the sidewalk, confirm that Thompson's back patio qualifies as a "public place."

Kamp and Thompson contend that Johnson would not be able to see Kamp's penis from the perspective on the sidewalk. Thompson implicitly argues that this absence of sight precludes a finding on the recklessness element of the public lewdness offense. However, the terms of the statute do not require actual viewing. It requires exposure, and thereto recklessness as to whether a person may be present, and offended or alarmed, by the exposure. Ala. Code § 13A-12-130(a). Kamp admitted to the exposure, and he clearly was reckless regarding the potential presence of someone on the sidewalk who would have been offended by his public urination. *See United States v. Burnett*, 291 F. App'x 319, 320 (11th Cir. 2008) (Alabama's public lewdness statute encompasses not just victims who observe the challenged conduct, but also "anyone else who was likely to observe the conduct"); *Klemetti v. Foster*, No. 3:11CV137-MEF, 2012 WL 763174, at *4 (M.D. Ala. Feb. 2, 2012) (The "plain language of [the Alabama public lewdness statute] requires only that the person be 'reckless about whether

another *may* be present who will be offended or alarmed by [the alleged offender's] act.'") (citing Ala. Code § 13A–12–130(a)), *rept. and recommend. adopt.*, No. 3:11-CV-137-MEF, 2012 WL 777285 (M.D. Ala. Mar. 8, 2012).[9]

In any event, assessing arguable probable cause does not require establishment of every element of a crime. *Brown*, 608 F.3d at 735. Based upon Kamp's admitted urination on Thompson's publicly-viewable patio, Johnson possessed at least arguable probable cause to arrest Kamp. *C.f.*, *Jakes v. State*, 398 So.2d 342, 345-46 (Ala. Crim. App. 1981) (For an officer to arrest a suspect for commission of a misdemeanor in the officer's presence, the law would "permit an arrest where the officer was apprised through the operation of any of his senses that a misdemeanor was being committed or attempted. . . . [I]t would not be essential that an officer actually see the commission of an offense if another of his physical senses, perhaps that of smell or hearing, could afford him a fair inference that the offense was indeed being perpetrated at that point in time.").

Based upon the finding of arguable probable cause to arrest Kamp, the basis for searching Thompson's apartment for Kamp manifests clearly. Officer Johnson clearly saw Kamp enter Thompson's apartment after arguably witnessing Kamp perpetrate the public lewdness offense. As a result, the officers sustained probable cause to search

---

[9] For example, if Kamp stood in the middle of the street and exposed himself, and onlookers turned away before viewing his genitals, his conduct surely would fall within the parameters of the public lewdness statute.

Thompson's apartment because a "legitimate object of a search," i.e., Kamp, was located there. *Steagald*, 451 U.S. at 213; *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999)("Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location.").

*There Does Not Exist Any Clearly Established Constitutional Law Proscribing the Officers' Hot Pursuit of Kamp Into Thompson's Apartment*

In addition to probable cause to arrest Kamp and search Thompson's apartment to effect the arrest, Johnson and Redcross needed an exception to the warrant requirement to enter the apartment and arrest Kamp. The officers rely upon the exigent circumstances exception for warrantless arrests, in particular the hot pursuit doctrine. Upon review of applicable precedent, there exists no clearly established constitutional law from the United States Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court proscribing the officers' entry into Thompson's apartment to arrest Kamp for the public lewdness offense.

The presumption against warrantless searches "may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness. . . . Accordingly, the warrant requirement is subject to certain reasonable exceptions." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (citations, and internal quotation marks omitted). "One well-recognized exception [to the search

warrant requirement] applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *King*, 563 U.S. at 460 (citations and internal quotation marks omitted); *see also United States v. Santa*, 236 F.3d 662, 669 (11th Cir. 2000) ("The exigency exception only applies when "'the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action.'") (citation omitted). Thus, a "'warrantless search is allowed . . . where both probable cause and exigent circumstances exist.'" *Id.* at 668 (quoting *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc)). "Recognized situations in which exigent circumstances exist include: danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and 'hot pursuit' of a fleeing suspect.'" *Santa* 236 F.3d at 669 (citation omitted).

"An objective test applies to the exigency determination." *United States v. Bradley*, 644 F.3d 1213, 1261 (11th Cir. 2011) (citation omitted) (emphasis in original); *see also United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990) ("Police officers relying on this exception must demonstrate an objectively reasonable basis for deciding that immediate action is required."). The Supreme Court has "'repeatedly rejected a subjective approach,' asking only whether 'the circumstances, viewed objectively, justify the action.'" *King*, 563 U.S. at 464 (citations omitted). "Indeed, [the Supreme Court has] never held, outside limited contexts such as an 'inventory search or administrative

inspection . . ., that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment.'" *Id.* (citations omitted).

In this case, the officers declare they were in hot pursuit of Kamp when they entered Thompson's apartment to arrest him. Hot pursuit ensues when police pursue a suspect fleeing from a recently committed crime. *Warden v. Hayden*, 387 U.S. 294, 294-310 (1967). A "hot pursuit means some sort of chase, but it need not be an extended hue and cry 'in and about [the] public streets.'" *United States v. Santana*, 427 U.S. 38, 42-43 (1976). However, "the claim of hot pursuit is unconvincing [where] there is no immediate or continuous pursuit of the [suspect] from the scene of the crime." *Welsh v. Wisconsin*, 466 U.S. 740, 743 (1984).

Based upon the undisputed facts, the officers maintained an immediate and continuous pursuit of Kamp into the apartment. After Johnson observed Kamp urinating on the patio, he intended to arrest Kamp when Kamp went back into Thompson's apartment. Johnson did not know how to access Thompson's patio area from the sidewalk, so he spent a few minutes looking for the entrance. Johnson encountered Redcross during his search, and he informed Redcross he was attempting to arrest a male subject for urinating in public view. He and Redcross then discovered the wooden gate entrance to Thompson's patio, and upon entering they knocked on her

patio door. Thompson does not dispute Johnson's testimony regarding these facts,[10] and thus the court finds that no genuine dispute exists as to whether Johnson maintained an immediate and continuous pursuit of Kamp. *See Warden*, 387 U.S. at 298 ("The police were informed that an armed robbery had taken place, and that the suspect had entered [a certain house] less than five minutes before they reached it. They acted reasonably when they entered the house and began to search for a man of the description they had been given . . . ."); *United States v. Santana*, 427 U.S. 38, 42 (1976) ("In *Warden* . . . , we recognized the right of police, who had probable cause to believe that an armed robber had entered a house a few minutes before, to make a warrantless

---

[10]  Typically, "'the mere fact that [a] witness is interested in the result of [a] suit is deemed sufficient to require the credibility of [the witness's] testimony to be submitted to the jury as a question of fact.'" *Sartor v. Arkansas Nat. Gas Corp.*, 321 U.S. 620, 628 (1944) (quoting *Sonnentheil v. Christian Moerlein Brewing Co.*, 172 U.S. 401, 408 (1899)). Nevertheless, the court may consider the uncontradicted and unimpeached testimony of such interested witnesses when "no reasonable point of view" tarnishes its veracity. *Chesapeake & O. Ry. Co. v. Martin*, 283 U.S. 209, 216 (1931); *see also Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen & Firemen Ret. Sys. of City of Detroit,* 50 F.3d 908, 921 (11th Cir. 1995) (Judgment as a matter of law is appropriate where the uncontroverted testimony of an interested witness is inherently plausible and corroborated by other evidence.) (citing *Brown v. Ford Motor Co.,* 479 F.2d 521, 523 (5th Cir. 1973)).  Such evidence strictly manifests as incontrovertible "by proof or circumstances, directly or inferentially"; indeed, "it is difficult to see why, if inaccurate, [such evidence] readily could not have been" contradicted.  *Martin*, 283 U.S. at 216; *see also Quinn v. Sw. Wood Prod., Inc.*, 597 F.2d 1018, 1024 (5th Cir. 1979)[10] ("[I]t has been held that such testimony [of interested witnesses], even by an employee of a party, must be taken as true where it was candid, the witness was not impeached, his credibility was not questioned, and his testimony was not controverted although, if inaccurate, it could readily have been shown to be so.") (citing *Martin*, 283 U.S. 209; *Texas Co. v. Hood*, 161 F.2d 618 (5th Cir.), *cert. denied*, 332 U.S. 829 (1947)); *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3rd Cir. 2007) ("The fact is that in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible[,] even if the testimony is that of an interested witness."); *Traylor v. Brown*, 295 F.3d 783, 791 (7th Cir. 2002) ("We do not interpret the quoted language so broadly as to require a court to ignore the uncontroverted testimony of company employees."); *Wilcox v. State Farm Mutual Automobile Insurance Co.*, 253 F.3d 1069, 1071 (8th Cir. 2001) (Even [if an employee's] affidavit [could] nominally fall within *Reeves*, "where [the plaintiff] was given a clear opportunity to contradict [the defense] affidavit but did not, it would not be obvious error to include the affidavit's contents in the factual mix relevant to summary judgment.").

entry to arrest the robber and to search for weapons. This case, involving a true 'hot pursuit,' is clearly governed by *Warden* . . . .) (footnote omitted); Wayne R. LaFave, 3 Search & Seizure § 6.1(d) (5th ed. Oct. 2018 Update) ("Another exception to the *Payton-Steagald* warrant requirement is the so-called "hot pursuit" rule, first recognized by the Supreme Court in *Warden v. Hayden*.").

However, Thompson argues that the hot pursuit doctrine does not apply in situations involving absconders who committed minor offenses. There exists some traction for this contention, as set forth in the Supreme Court's decision in *Welsh*:

> Our hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor. * * *

> We therefore . . . hold that an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made. Moreover, . . . application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed.

*Welsh*, 466 U.S. at 750, 753. Notwithstanding the existence of some authority adopting the foregoing dicta from *Welsh*, the Supreme Court subsequently suggested such a limitation on the hot pursuit doctrine may only apply to nonjailable offenses. *See Illinois v. McArthur*, 531 U.S. 326, 336 (2001) (in upholding officers' prevention of an owner from entering his home until a search warrant was obtained, the Court distinguished *Welsh* as involving "nonjailable" crimes, not "jailable" misdemeanors.

Most importantly, the Supreme Court ruled that it has not clearly established any law on whether the hot pursuit doctrine applies in the context of minor offenses. *See Stanton v. Sims*, 571 U.S. 3 (2013). In *Stanton*, an officer pursued a suspect to arrest him for the jailable misdemeanor of disobeying an officer's order to stop. The suspect fled through the front gate of a solid wood fence surrounding the curtilage of the plaintiff's residence, and as the officer followed he kicked the gate open, accidentally striking and injuring the plaintiff.

In the subsequent § 1983 action brought by the plaintiff, a unanimous Supreme Court declined to establish any constitutional rule regarding hot pursuits of suspects who commit minor offenses. Rather, the Court concluded the lower court had "read *Welsh* … far too broadly" in prohibiting application of the hot pursuit doctrine to minor offenses. 571 U.S. at 9. As the Court explained, there was no hot pursuit in *Welsh* because there was no immediate or continuous pursuit. *Id.* at 8, 9. Furthermore, *Welsh* "did not lay down a categorical rule for all cases involving minor offenses," and more to the point, *Welsh* did not establish any rule regarding the hot pursuit doctrine vis-à-vis the seriousness of the crime at issue. *Stanton*, 571 U.S. at 8, 9.

In an unpublished opinion, the Eleventh Circuit relied upon *Stanton* to approve an officer's hot pursuit of a fleeing misdemeanant into a third party's residence. *See United States v. Concepcion*, 748 Fed. Appx. 904, 906 (11th Cir. 2018) ("DeMoya was in hot pursuit of Concepcion when he attempted to force his way into Sweeting's apartment. .

. . Even if, as Concepcion argues, he was perceived as a misdemeanant instead of a felon, the detective could enter Sweeting's apartment to pursue Concepcion.") (citing *Stanton*, 571 U.S. at 9).

Based upon the foregoing precedent and authority, there exists no clearly established law prohibiting application of the hot pursuit doctrine to misdemeanants who flee into third-party residences. Therefore, Thompson does not sustain her burden, and Johnson and Redcross warrant qualified immunity on Thompson's unlawful entry claim.

## II.    The Officers Possessed the Requisite Probable Cause to Arrest Thompson

Thompson claims the officers, and in particular Redcross, perpetrated a wrongful arrest in violation of the Fourth Amendment. As noted in the previous section, law enforcement officers may effect warrantless arrests "where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citations omitted).

Furthermore, in the qualified immunity context an officer need only sustain "arguable" probable cause, not actual probable cause. *Brown*, 608 F.3d at 735.

The authorities charged Thompson with "intentionally prevent[ing], or attempt[ing] to prevent Bennie Johnson & Jeff Redcross, FPD from affecting a lawful arrest of [herself], or of Mason Kamp and Cody Sloas in violation of 13A-010-041."

Alabama law states that a person commits the crime of resisting arrest "if [she] intentionally prevents or attempts to prevent a peace officer from affecting a lawful arrest of [herself] or of another person." Ala. Code §13A-10-41. An arrest without a warrant, as here, may legally occur "if a public offense has been committed or a breach of the peace threatened in the presence of the officer." Ala. Code § 15-10-3(1)(1975).

At the outset, this determination proceeds initially on whether Thompson resisted Kamp's arrest. If the officers sustained arguable probable cause to arrest Thompson for resisting Kamp's arrest, then the court may consider her resistance to her own arrest, although such an inquiry would be unnecessary.[11] A charge of resisting her own arrest requires a predicate offense preceding the resistance, and the only offense Thompson allegedly perpetrated prior to resisting her own arrest constitutes the resistance to Kamp's arrest. *See Brown*, 608 F.3d at 735 n. 16 ("We also note that the resisting arrest charge against Plaintiff Brown arose from her conduct during the arrest for disorderly conduct, so the resisting arrest charge depends in part on the validity of Plaintiff Brown's arrest for disorderly conduct."); *see also Exford v. City of Montgomery*, 887 F. Supp. 2d 1210, 1224 (M.D. Ala. 2012)("Resisting [her own] arrest quite obviously could not serve as probable cause for initiating [plaintiff's] arrest—that would put the

---

[11] The existence of arguable probable cause for at least one charge suffices to grant the officers qualified immunity on Thompson's Fourth Amendment false arrest claim. *See Lee v. Ferraro*, 284 F.3d 1188, 1195-96 (11th Cir. 2002); *Whittington v. Town of Surfside*, 490 F. Supp. 2d 1239, 1251 (S.D. Fla. 2007), *aff'd*, 269 F. App'x 918 (11th Cir. 2008) ("[S]o long as probable cause existed to arrest Plaintiff for any offense, the arrest and detention are valid even if probable cause was lacking as to some offenses. . . .").

cart before the horse."); *Summers v. Martin*, 2013 WL 6499366, at *10 (N.D. Ala. Dec. 11, 2013)("a lawful arrest is the prerequisite for the crime of resisting arrest").

The officers possessed arguable probable cause to arrest Thompson for resisting Kamp's arrest. A reasonable officer in their position could have believed, even if mistakenly, that Thompson intentionally interfered with their efforts to arrest Kamp. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) ("To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.'") (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996))); *Wilkerson v. Seymour*, 736 F.3d 974, 978 (11th Cir. 2013) (Evaluating whether an officer possessed arguable probable cause to arrest a suspect rests upon "the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later.") (quotation omitted).

First, Thompson presented a physical impediment at the patio door when the officers attempted to access the apartment and arrest Kamp. Thompson asserts that the officers bumped her out of the way with the door, while Johnson declares Thompson attempted to close the door as he was following Redcross into the apartment. Construing this evidence in the light most favorable to Thompson, clearly

the officers encountered a physical impediment to their entry into the apartment, namely Thompson. In Thompson's favor, her impediment may have been accidental rather than intentional; nevertheless, a reasonable officer in the Defendants' position would have perceived an impediment to a lawful arrest.

Second, Thompson attempted to resist Kamp's arrest with her comments to the officers. Case authority characterizes the mere use of speech intended to obstruct a seizure as resistance to arrest. *See Sims v. State*, 733 So. 2d 926, 930 (Ala. Crim. App. 1998) (lying to officers constitutes resisting arrest, because "the plain and ordinary meaning of the statute's language does not limit resisting arrest to physical activity"); *Ransom v. Sherman*, 697 F. App'x 638, 638-39 (11th Cir. 2017) (plaintiff's "yelling at the officers as they were arresting her son" demonstrate arguable probable cause of resisting arrest); *Bey v. Abrams*, No. 7:14-CV-02205-RDP, 2017 WL 1407507, at *8 (N.D. Ala. Apr. 20, 2017) ("[U]nder Alabama law an offender may use words alone, and need not use physical force, in order to resist arrest . . . .") (citing *Sims, supra*, 733 So. 2d at 930).

During the altercation in her apartment, Thompson declared to the officers that they were not allowed in her apartment and had no right to be there. As the Eleventh Circuit held in *Ransom*, yelling and shouting at officers as they attempt to arrest another person, and continuing the shouting in violation of the officers' instructions, gives a reasonable officer arguable probable cause to arrest a person for resisting arrest.

32

*Ransom*, 697 F. App'x at 638, 639.   Likewise in *Bey*, officers sustained arguable probable cause to arrest the plaintiff for resisting the arrest of another person when he intentionally prevented their apprehension of the suspect.   Notably, the plaintiff remarked that the officers did not have the authority to arrest the other person and attempted to close a door on them to prevent their entry into a residence.   *Bey*, 2017 WL 1407507 at *8.   In the circumstances at bar, the officers could reasonably view Thompson's attempt to order them out of her apartment as an intentional prevention of Kamp's arrest.

Finally, Thompson's remarks that Johnson and Redcross were posing as officers buttress the assessment she was resisting Kamp's arrest.   Upon re-entering Thompson's apartment from the patio after encountering Officer Johnson, Kamp told Thompson someone outside may be posing as a police officer.   In her 911 call, Thompson herself informed the dispatcher that two men were posing as police officers in her apartment.   Thompson's remarks to the dispatcher indicate that she did not believe the officers had the authority to arrest Kamp, which itself represents resistance to the arrest.   *See* Commentary to Ala. Code § 13A-10-41 ("Note that it is not necessary that defendant used force or violence in obstructing the officer, only that [she] engaged in some conduct intending to prevent the officer from effecting a lawful arrest."). Therefore, pursuant to the case authority Johnson and Redcross possessed arguable probable cause to arrest Thompson for interfering with Kamp's arrest.

Subsequently, Thompson resisted her own arrest stemming from the interference with Kamp's arrest. She admitted that she resisted her arrest because she did not understand Redcross was an officer and was arresting her, and the evidence portrays that she possessed a handgun, backed away from Redcross as he approached her, and shouted that he was not going to place her in handcuffs. Thompson's contention that she did not understand Redcross was an officer is belied by the fact that the uniformed officers were present when Redcross approached her to effect the arrest, and the uniformed officers did not intervene to stop Redcross from performing his duties. Therefore, because the officers sustained arguable probable cause to arrest Thompson for resisting arrest, they are entitled to qualified immunity from Thompson's wrongful arrest claim.[12]

## III. Redcross's Actions Towards Thompson Did Not Constitute Excessive Force

Redcross claims qualified immunity on Thompson's Fourth Amendment excessive force claim. "'The Fourth Amendment's freedom from unreasonable

---

[12] Alabama law gives a citizen the right to use force to resist an unlawful arrest. *See Morris v. Town of Lexington Alabama*, 748 F.3d 1316, 1325 (11th Cir. 2014) (quoting Commentary to Ala. Code § 13A-10-41). Moreover, a person "in lawful possession or control of premises ... may use physical force upon another person when and to the extent that he reasonably believes it necessary to prevent or terminate what he reasonably believes to be the commission or attempted commission of a criminal trespass by the other person in or upon such premises." *Id.* (citing Ala Code § 13A-3-25(a)). Of course, the foregoing law does not apply to the circumstances of this case because the officers were effecting a lawful arrest of Kamp. At best, the foregoing provisions constitute defenses that Thompson could have raised against the resisting arrest charges, but they do not detract from the finding that the officers possessed arguable probable cause to arrest her.

searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest.'" *Glasscox v. City of Argo*, 903 F.3d 1207, 1213–14 (11th Cir. 2018) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)). A court assesses the excessive force inquiry by determining "'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.'" *Id.* (citation omitted). "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable"; a court does not take into account a defendant's state of mind. *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* Accordingly, "the application of de minimus force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000). However, "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). In conducting this examination, the court should evaluate

"'(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (citations omitted); *see also Glasscox*, 903 F.3d at 1214 (applying same factors).

Analyzing Thompson's claims pursuant to the foregoing standard, the court grants summary judgment because Redcross utilized a reasonable amount of force in effecting Thompson's arrest.[13] The first and third factors coalesce because the crime at

---

[13] Thompson contends Redcross does not deserve qualified immunity because any force used in an unlawful arrest is necessarily excessive. "Under this Circuit's law . . . a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Bashir v. Rockdale County, Ga.*, 445 F.3d 1323, 1331 (11th Cir. 2006)(quoting *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000)). The Eleventh Circuit elaborated on this holding in *Bashir*:

> The right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to affect it." *Graham v. Connnor*, 490 U.S. 386, 396 (1989). It follows, then, if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest. This is the premise of Bashir's "excessive force" claim; but this is not what is meant by "excessive force." An excessive force claim evokes the Fourth Amendment's protection against the use of an unreasonable quantum of force (i.e., non-de minimis force unreasonably disproportionate to the need) in effecting an otherwise lawful arrest. When properly stated, an excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest. A claim like Bashir's—that the deputies used excessive force in the arrest because they lacked the right to make the arrest—is not a discrete constitutional violation; it is dependent upon and inseparable from his unlawful arrest claim. *Jackson*, 206 F.3d at 1171. We reiterate, where an excessive force claim is predicated solely on allegations the arresting officer lacked the power to make an arrest, the excessive force claim is entirely derivative of, and is subsumed within, the unlawful arrest claim. *Id.; Williamson v. Mills*, 65 F.3d 155, 158-59. Bashir does not present a discrete excessive force claim and, therefore, his excessive force claim fails as a matter of law.

issue is resisting arrest. Although "resisting arrest without force does not connote a level of dangerousness that would justify a greater use of force," *Fils*, 647 F.3d at 1288, the undisputed facts, drawn in Thompson's favor, demonstrate Thompson actively resisted the arrests at issue.

During the incident in question, Thompson retrieved her gun, which displays a level of seriousness to her resistance. Although the officers may not have initially seen the firearm, the parties do not dispute that Kamp instructed Thompson to retrieve the firearm during the altercation.

Subsequently, the 911 call audio identifies Thompson remarking, "you're not putting me in handcuffs," and Thompson confirmed she backed away before Redcross tackled her. Thompson declared she resisted Redcross because did not understand that a law enforcement officer was arresting her, yet as noted earlier she did so when uniformed officers did not impede Redcross from effecting the arrest. A reasonable officer could have deemed Thompson's active verbal resistance, her retreat from Redcross, and Kamp's instruction for her to retrieve her handgun as a display of resistance requiring some degree of physical coercion to counteract it.

The second factor assesses whether Thompson posed an immediate threat to the officers' or others' safety. After the officers entered her apartment, Thompson

---

*Bashir*, 445 F.3d at 1332. To the extent that Thompson bases her excessive force claim against Redcross on the argument that he was engaged in an unlawful arrest, her argument fails as a matter of law.

informed them they were not allowed in her apartment and needed to leave. While her initial verbal warnings alone arguably did not pose a threat to the officers' safety, Thompson possessed a loaded handgun and pointed it at the floor while calling 911. None of the individual defendants involved confirm exactly when they first saw Thompson's handgun, with the exception of Lambert's testimony indicating that he first saw the gun when it flew out of Thompson's hands after Redcross tackled her on the floor. However, a reasonable officer could easily have deemed Thompson's handgun as representing an immediate danger when Kamp instructed her to retrieve it.

Therefore, Redcross is entitled to qualified immunity on Thompson's excessive force claim.

## IV. State Agent Immunity Bars Thompson's State Law Claims

Redcross and Johnson contend state agent immunity bars liability for Thompson's state law claims for false arrest, false imprisonment, and assault and battery.[14]   The court finds their argument bears merit as to all of Thompson's state law claims.

---

[14] In her complaint, Thompson lists the count as a claim of "Assault/Excessive Force." "Under Alabama law, excessive force during an arrest constitutes assault and battery." *Ruffino v. City of Hoover*, 891 F. Supp. 2d 1247, 1279 (N.D. Ala. 2012)(citing *Franklin v. City of Huntsville*, 670 So. 2d 848, 852-53 (Ala. 1995)). Furthermore, Thompson states in her response to Defendants' motion for summary judgment that "a reasonable jury can conclude that defendants unlawfully . . . arrested her without even arguable probable cause, tackling her to the ground in the process." Therefore, the court will analyze this claim as one of assault and battery.

Under Alabama law, Redcross and Johnson, as city police officers, enjoy immunity from tort liability "arising out of his [ ] conduct or performance of any discretionary function within the line and scope of his [ ] law enforcement duties." Ala. § 6–5–338(a). The Alabama Supreme Court described this immunity doctrine in *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), and later revised it in *Hollis v. City of Brighton*, 950 So. 2d 300 (Ala. 2006). In relevant part:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6–5–338(a), Ala. Code 1975.

*Hollis*, 950 So.2d at 309. However, "a State-agent shall not be immune from civil liability" in his individual capacity when required by law, or "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Cranman*, 792 So.2d at 405.

Courts employ a burden-shifting analysis when determining whether state-agent immunity applies. *Howard v. City of Atmore*, 887 So. 2d 201, 205 (Ala. 2003). The peace officer initially bears the burden of establishing a plaintiff's "claims arise from a function that would entitle [the defendant] to immunity." *Id.*; *see also Walker v. City of Huntsville*, 62 So. 3d 474, 496-98 (Ala. 2010). To carry that burden, a defendant must establish (i) he or she was a peace officer on the date of the incident in question

(ii) performing law enforcement duties at the time of the circumstances in question and (iii) exercising judgment or discretion when doing so. *Howard*, 887 So. 2d at 204. "The burden then shifts to the plaintiff to show that one of the two categories of exceptions . . . recognized in *Cranman* is applicable." *Ex parte Kennedy*, 992 So. 2d 1276, 1282 (Ala. 2008).

For all of the state law claims, there exists no dispute as to the first element as Redcross and Johnson qualify as "peace officer[s]." *See Borders v. City of Huntsville*, 875 So.2d 1168, 1178 (Ala. 2003) ("As a police officer, [the defendant] qualifies as a peace officer for purposes of [discretionary-function immunity]."); *Howard*, 887 So.2d at 204 ("It is undisputed that [the defendant] was a law enforcement officer at the [relevant time] . . . . The first element is, therefore, satisfied.").

Redcross and Johnson also satisfy the second element because they engaged in law enforcement duties while entering Thompson's apartment and apprehending her. *See Cranman*, 792 So.2d at 405 ("arresting or attempting to arrest persons" included within actions garnering immunity); *House v. State*, 380 So. 2d 940, 941 (Ala. 1979) (holding that for immunity purposes law enforcement duties include the "detection and apprehension of criminals").

Redcross and Johnson also satisfy the third element, as they were exercising judgment or discretion in pursuing Kamp into Thompson's apartment and arresting Thompson. Enforcement of the criminal laws qualifies as a discretionary function.

*See Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1268 (11ᵗʰ Cir. 2010) ("Police investigations and arrests usually are considered 'discretionary function[s] within the line and scope of . . . law enforcement duties' for the purposes of discretionary-function immunity.") (quoting *Swan v. City of Hueytown*, 920 So. 2d 1075, 1078–79 (Ala. 2005)); *Sheth v. Webster*, 145 F.3d 1231, 1238–39 (11ᵗʰ Cir. 1998) (police officers' use of force and arrest of plaintiff qualify as discretionary functions under Alabama law).

However, Thompson contends Redcross and Johnson acted in derogation of law or acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law. As reflected previously, Thompson bears the burden of establishing this exception to state agent immunity. *See Brown*, 608 F.3d at 741.

Because the court previously determined in the federal qualified immunity analysis that the officers sustained arguable probable cause to arrest Thompson for resisting arrest, Thompson cannot satisfy her burden as to her false arrest and false imprisonment claims. A false arrest claim requires proof "'the defendant caused [plaintiff] to be arrested without probable cause.'" *Ex parte Harris*, 216 So. 3d 1201, 1213 (Ala. 2016) (quoting *Walker v. City of Huntsville*, 62 So. 3d 474, 493 (Ala. 2010)). As described previously, "'probable cause exists where the facts and circumstances within the officer's knowledge and of which he has reasonable trustworthy information are sufficient to warrant a man of reasonable caution in the belief that an offense has been

or is being committed.'" *Harris*, 216 So.3d at 1213 (quoting *Walker*, 62 So.3d at 492) (internal alteration omitted). Thus, "'for a detention to be valid, the officer must reasonably, and in good faith, suspect the individual detained of being involved in some form of criminality.'" *Harris,* 216 So.3d at 1213 (quoting *Walker*, 62 So.3d at 493) (internal alteration omitted). Establishing "probable cause does not require evidence or information sufficient to support a conviction." *Harris*, 216 So.3d at 1213 (citing *Dixon v. State*, 588 So.2d 903 (Ala. 1991)).

"False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code § 6–5–170. A false arrest will support a claim for false imprisonment. *Harris*, 216 So.3d at 1213 (citing *Upshaw v. McArdle*, 650 So.2d 875 (Ala. 1994)).

Notably, the Alabama Supreme Court applies the same arguable probable cause standard elucidated earlier in determining whether an officer receives state-agent immunity for his role in an arrest. *Brown*, 608 F.3d at 741 (citing *Borders v. City of Huntsville*, 875 So.2d 1168, 1180 (Ala. 2003); *see also Harris*, 216 So.3d at 1213 ("Arguable probable cause exists 'when an officer makes an arrest lacking probable cause if officers of reasonable competence in the same circumstances and with the same knowledge would disagree as to whether probable cause existed.'") (quoting *Borders*, 875 So.2d at 1179); (citing *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004)). That is, establishing arguable probable cause for an arrest and detention forestalls a finding that

a defendant-officer acted willfully, maliciously, fraudulently, in bad faith, beyond authority, or under a mistaken interpretation of the law. "Whether a police officer possesses probable cause or arguable probable cause to arrest an individual depends on the elements of the alleged offense and the operative set of facts." *Harris*, 216 So.3d at 1213 (citing *Brown*, 608 F.3d at 735).

As held above, Redcross receives qualified immunity for his conduct in arresting Thompson because the facts, construed in the light most favorable to Thompson, demonstrate Redcross possessed arguable probable cause to arrest Thompson for resisting arrest. Therefore, the officers receive state-agent immunity from Thompson's false arrest and false imprisonment claims. *See Brown*, 608 F.3d at 741-42.

The assault and battery claim garners the same outcome. "The plaintiff in an action alleging assault and battery must prove '(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.'" *Harper v. Winston County*, 892 So. 2d 346, 353 (Ala. 2004)(quoting *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998)). However, in making the arrest, "a police officer may use reasonable force and may be held liable only if more force is used than is necessary to effectuate the arrest." *Franklin v. City of Huntsville*, 670 So. 2d 848, 852 (Ala. 1995)(citing § Ala. Code 13-3-27(a))("A peace officer is justified in using that degree of physical force which he reasonably believes to be necessary, upon a person in order: (1) To make an arrest for a

misdemeanor, violation or violation of a criminal ordinance . . . unless the peace officer knows that the arrest is unauthorized.").

Because the court previously determined in the federal qualified immunity analysis that Redcross exercised reasonable force in arresting Thompson, Thompson cannot satisfy her burden as to her assault and battery claim. *See Walker*, 62 So. 3d 474 (holding that a plaintiff's assault and battery claims against a police officer were barred by collateral estoppel after a federal court, resolving the same plaintiff's § 1983 excessive force claim, determined the police officer's use of force did not violate the Fourth Amendment). Furthermore, Thompson fails to demonstrate that Redcross's actions constituted willful, malicious, or bad faith conduct. Therefore, Redcross receives stage-agent immunity from Thompson's assault and battery claim.

## CONCLUSION

Based on the foregoing analyses, the court **GRANTS** Defendants' Motion for Summary Judgment.


_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE